UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL SHOPMEN PENSION FUND, et al.<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>GEORG FISCHER DISA d/b/a DISA INDUSTRIES, INC.,<br><br>　　　　　Defendant. | Civil Action No. 08-CV-0132 (RCL) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff, the National Shopmen Pension Fund's (the "Fund") complaint seeks to collect delinquent withdrawal liability contributions from Defendant to which it is entitled under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") as codified into the Employee Retirement Income Security Act of 1974 ("ERISA") at 29 U.S.C. §§ 1381-1461.  Defendant argues in its Motion for Judgment on the Pleadings that the Fund did not properly calculate its withdrawal liability payment amount under MPPAA.  The Court should deny Defendant's Motion because it is black letter law that disputes regarding the computation of the amount of the monthly payment are properly made to the arbitrator, not this Court.  Until the arbitrator rules to the contrary, under MPPAA, Defendant must pay $978 per month in accordance with the Fund's computation.

**FACTS**

The basic facts of the case are not in dispute. Defendant withdrew from the Fund in 2001. By letter dated June 21, 2006, the Fund notified Defendant of its withdrawal liability in the amount of $372,472. The letter included a spreadsheet with the calculations and stated that Defendant should pay $652 per month. However, according to the spreadsheet that the Fund sent to Defendant, the monthly payment should have been $978. Defendant began paying $652 per month. On January 24, 2007, Fund counsel sent Defendant's attorneys a letter explaining the error and stating that Defendant should be paying $978 per month instead of $652 per month. Defendant refused to pay $978 per month and has continued paying $652 per month.

Defendant timely requested arbitration of the Fund's withdrawal liability determination, and the issue is before an arbitrator. The Fund filed the instant action to require Defendant to pay $978 per month and to collect the difference pending a ruling by the arbitrator, plus interest, liquidated damages, and attorneys' fees and costs.

**ARGUMENT**

**I.   The issue of the correct monthly payment amount is not before this Court - it is subject to arbitration. In the meantime Defendant must pay the amount demanded by the Fund.**

Defendant is incorrect that, "[t]he sole issue that is properly before this Court concerns the amount of money that DISA is required to pay each month unless and until an arbitrator rules in favor of DISA." Defendant's Motion, p.2, ¶ 4 (emphasis in original). ERISA is very clear that all disputes over withdrawal liability are to be resolved by arbitration. *Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1341 (7th Cir. 1992). In the interim, the employer must make

2

the assessed withdrawal liability payments, and the Fund may file an action in district court to require the employer to do so. *See Lady Baltimore Foods,* 960 F.2d at 1341; *Connors v. Calvert Development Company*, 662 F. Supp. 877 (D.D.C. 1985); *I.A.M. National Pension Fund Benefit Plan v. Dravo Corporation,* 641 F. Supp. 50 (D.D.C. 1985). The amount of periodic payments is the amount determined by the Fund. *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Central Transport, Inc.*, 935 F.2d 114, 116 (7th Cir. 1991). "If [the employer] wins the arbitration he will get back whatever he has paid but the rule is pay first, arbitrate after." *Lady Baltimore Foods* at 1341. As the court in *Central Transport* explained:

> Centra present three reasons why it believes the Fund's computation to be erroneous. They are neither here nor there, and we do not discuss them. Whether the Fund has computed the withdrawal liability correctly is a question for the arbitrator. Section 1399(c) calls on the employer to pay "notwithstanding" contentions that may prevail in the end. The MPPAA puts payment ahead of decision. Centra wishes it were the other way around, but the employers lost that fight a decade ago in Congress.

*Central Transport, Inc*., 935 F.2d at 118 (citations omitted). Therefore, the issue of the correct monthly payment amount is not before this Court. It is subject to arbitration. In the meantime, Defendant must pay the amount demanded by the Fund, which is $978 per month.

### II. The Fund's determination under the statute requires a monthly payment of $978.

In its Motion for Judgment on the Pleadings, Defendant argues that the Fund had no authority to change its position once notification and demand for payment was made because the amount it has to pay is statutorily determined. Thus, Defendant suggests that

3

if a mistake is made in the notification letter, it should have to pay less than the statute requires. Defendant offers no legal support for this absurd argument and there is none. This position is totally inconsistent with the policy goal behind ERISA's withdrawal liability provisions which is the accurate collection of withdrawal liability so as to relieve the funding burden on remaining employers. *See Masters, Mates & Pilots Pension Plan v. Pension Benefit Guaranty Corp.*, 900 F.2d 727, 735-36 (4th Cir. 1990).

Nevertheless, the fact is that the Fund did not "change" its position. As the spreadsheet which Defendant attaches as Exhibit A to its brief clearly shows, the Fund is simply asking that Defendant pay the monthly amount determined pursuant to its computations under MPPAA. Defendant does not dispute that the spreadsheet (Defendant's Exhibit A) displays the Fund's calculations under MPPAA. What it disputes is the Fund's determination of the monthly payment amount.

Specifically, Defendant contends that the average annual number of contribution base units for the three-year period (line (I) of the spreadsheet) should be $31,008. Defendant arrives at this number by averaging in a zero for one of the three years because Defendant only made contributions to the Fund for two years. However, this interpretation is as odds with the purpose of the MPPAA annual payment provision which is to have the annual payment amount approximate the highest annual contributions made by the employer prior to withdrawal. *See* PBGC Opinion Letter 90-2, attached hereto as Exhibit A. Accordingly, as Defendant points out, and as the spreadsheet shows, the Fund's actuaries did not do this. Rather the Fund's actuaries did not average in a zero and determined the average number of hours to be 46,632. *See*

4

Defendant's Exhibit A, Line (I).  The result of this computation is a monthly payment amount of $978, as clearly shown on the spreadsheet. *See* Defendant's Exhibit A.

Defendant's argument that a zero should be used in the computation average is properly the subject of arbitration.  The arbitrator, who is familiar with withdrawal liability calculations, will hear argument from counsel and testimony from actuaries, and will then make a ruling on the issue.  However, in the meantime, Defendant must pay the monthly amount determined by the Fund in its computations, which is $978 per month.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings should be denied, and judgment should be entered in favor of the Fund.

Respectfully submitted,

/s/ Marc Rifkind
_____
Marc Rifkind, Esq. (D.C. Bar No. 416183)
Jeffrey S. Swyers (D.C. Bar No.454290)
SLEVIN & HART, P.C.
1625 Massachusetts Avenue, NW, Suite 450
Washington, DC   20036
202-797-8700  (Telephone)
202-234-8231  (Facsimile)

Counsel for Plaintiffs

**Certificate of Service**

I certify that on this 30th day of June, 2008, I caused the foregoing Plaintiffs' Response In Opposition to Defendant's Motion for Judgment on the Pleadings to be served to the party listed below, electronically, via the U.S. District Court District of Columbia's CM/ECF system:

William G. Miossi
WINSTON & STRAWN
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
Fax: (202) 371-5950
Email:  wmiossi@winston.com

Attorney for Defendant

/s/ Marc H. Rifkind
Marc H. Rifkind

Pension Benefit Guaranty Corporation

90-2

April 20, 1990

REFERENCE:
[*1] >4041A(e)>
4211 Withdrawal Liability.
>4211(b)>
>4211(c)(2)>
>4211(c)(3)>
4219 Notice & Collection of Withdrawal Liability.
>4219(c)(1)(C)(i)>
>29 CFR Part 2676>
29 CFR § 2676.15>

OPINION:

    I write in response to your letter requesting advice concerning the assessment, calculation and collection of withdrawal liability by a multiemployer pension plan under section 4219 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1399, in connection with the termination of the plan. Specifically, you seek the PBGC's opinion regarding various policies and procedures that have been proposed by the plan trustees.

    First, you seek our advice concerning the calculation of the amount of annual payments of withdrawal liability under ERISA § 4219(c)(1)(C)(i). This section requires a withdrawing employer to make an annual payment of withdrawal liability equal to the product of (i) the highest average annual number of contribution base units over a three consecutive plan year period during the ten plan years preceding the year of withdrawal, and (ii) the employer's highest contribution rate under the plan during the [*2] ten plan years ending with the year of withdrawal. The purpose of this section is to make the annual withdrawal liability payment approximate the highest annual contributions made by the employer prior to withdrawal.

    In this regard, you note that certain employers contribute to the plan pursuant to several different collective bargaining agreements, each requiring a different rate of contributions to the plan. You cite certain instances in which some of these employers have been making contributions to the plan at a high rate under a contract covering only a few employees, while contributing at a lower rate under other contracts covering many more employees. For some employers, the lowest contribution rate under any of their contracts may be half that of their highest contribution rate. You note that a literal application of section 4219(c)(1)(C)(i) could require that the amount of annual payments of withdrawal liability be computed using the highest contribution rate under any of the employer's contracts. This could result in annual payments of withdrawal liability that greatly exceed the employer's highest annual contributions on an aggregate basis under all contracts during [*3] the prior ten plan years.

    In order to avoid this result, you have asked whether the trustees may calculate the amount of the annual payment of withdrawal liability under section 4219(c)(1)(C)(i) by applying the formula described above on a contract-by-contract basis rather than using a cumulative approach. In other words, an employer's annual payment of withdrawal liability would equal the sum of the products described in section 4219(c)(1)(C)(i) computed separately for each of the employer's contracts.

    This appears to be a question of first impression under the Multiemployer Pension Plan Amendments Act of 1980 that is not directly addressed under the statute or the legislative history. However, the purpose of the annual payment provision is to have the annual payment of withdrawal liability approximate the highest level of contributions made by the employer during the ten plan years preceding the withdrawal. Consequently, we believe that the trustees' adoption of a contract-by-contract approach in calculating the annual payment is reasonable and consistent with the intent of the statute.

    Second, you have asked whether the trustees can adopt the contract-by-contract approach [*4] for purposes of


EXHIBIT A

determining the amount of contributions to be made by continuing employers following plan termination under ERISA § 4041A(a)(1). Under ERISA § 4041A(e), a contributing employer in a multiemployer plan that is terminated by plan amendment must continue to contribute at a rate that equals or exceeds the employer's highest rate of contributions during the five consecutive plan years ending on or before the plan termination date. It is the PBGC's view that this section does not require an employer contributing at different rates under separate contracts to make contributions under all contracts at the highest rate provided under any of the contracts. The trustees' proposal to increase contribution rates across the board by a fixed percentage of the rates under each individual contract appears to comply with section 4041A(e), provided that each resulting individual contract rate is at least equal to the highest rate under that contract during the five consecutive plan years ending on or before the plan termination date.

Third, you have asked whether the trust may be amended to permit individuals other than ones associated with or employed by a participating employer [*5] to serve as trustees. This proposed amendment does not raise any issues under Title IV of ERISA, and the PBGC therefore expresses no opinion concerning its adoption.

Fourth, you have asked whether it would be possible to use interest rates other than those prescribed under § 2676.15(c) of the PBGC's regulation on valuing plan assets and liabilities following mass withdrawal (29 CFR pt. 2676) for purposes of calculating the value of benefits under the plan following a mass withdrawal of employers. Specifically, the trustees want to use the interest rate earned under guaranteed investment contracts or other dedicated assets to value the benefit liabilities allocated to those assets. This is not permitted under the mass withdrawal valuation regulation. When a plan has terminated by mass withdrawal, the likelihood that dedicated assets will be held to maturity is significantly reduced. Moreover, because the valuation performed following a mass withdrawal termination is the basis for the plan's final reallocation and assessment of withdrawal liability, it is essential that the valuation interest rate not be overstated.

Fifth, we understand that for the 1988 plan year the plan's [*6] enrolled actuary has reallocated unfunded vested benefit liability from December 31, 1979 through December 31, 1987 on the basis of current information, some of which differs from that used in prior years by reason of corrections to certain data, including contribution and controlled group data. You have asked whether this reallocation affects employers that have previously withdrawn, including those employers that have paid or are currently paying their withdrawal liability, and those who are still in the process of contesting their withdrawal liability.

Under three of the alternative statutory allocation methods (ERISA §§ 4211(b), 4211(c)(2), 4211(c)(3)), the calculation of an employer's withdrawal liability is based (at least in part) on the value of the plan's unfunded vested benefits for the plan year immediately preceding the employer's withdrawal from the plan. If the trustees discover an error in the calculation of the plan's unfunded vested benefits for a prior plan year, the valuation for that prior year may not be changed retroactively. Any necessary correction of the plan's unfunded vested benefits should be reflected in the valuation that revealed the earlier error, [*7] or, if the error was not discovered in connection with a valuation, in the first valuation following the discovery. Any employer that withdraws in the plan year following the plan year to which the "corrected" valuation applies would be affected by the correction, by virtue of the operation of the statutory allocation methods.

However, where the plan discovers an error affecting the calculation of a particular employer's withdrawal liability (for example, where an audit reveals additional required contributions or where the plan learns of the existence of one or more controlled group members with an obligation to contribute), the employer would generally be subject to an additional assessment. A revised assessment correcting the error is appropriate where the original assessment is still the subject of litigation or arbitration.

If the employer contests the plan's right to revise its original assessment or issue a second assessment, this dispute, like other disputes involving withdrawal liability, must be resolved first through arbitration and then, if necessary, through the courts. In deciding whether the revised assessment should be allowed, the adjudicator should consider [*8] the relevant facts and circumstances, including whether the plan had access to the data necessary to correct the error at the time of the original assessment, whether the employer was aware or had reason to be aware of the error before the plan discovered it, whether the employer's objections relate to facts that were also applicable to the original assessment, and whether the employer would be prejudiced in maintaining its defense by the revised assessment. Generally, the last factor should be given the greatest weight.

Finally, you have asked whether upon its termination the plan must vest those employees who were not previously vested under the plan. From your letter, we understand that a plan participant does not become vested in his or her

accrued benefits under the plan until the participant has ten years of service for vesting purposes, at which time the participant becomes 100% vested in his or her accrued benefit. Section 411(d)(3) of the Internal Revenue Code of 1986, as amended (the "Code") provides that the right of participants to benefits accrued under the plan at the time of termination shall be nonforfeitable to the extent such benefits are funded. Therefore, [*9] if immediately prior to the date of plan termination the plan has unfunded vested benefits, additional vesting upon termination is not required under section 411(d)(3) of the Code.

I hope this letter is of assistance. If you have any additional questions, please contact Alan Siff of my staff at the above address or at (202) 778-8824.

Carol Connor Flowe
General Counsel