IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL SHOPMEN PENSION FUND, et al ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 08-CV-0132 (RCL) |
| ) | |
| GEORG FISCHER DISA d/b/a DISA ) | |
| INDUSTRIES, INC ) | |
| ) | |
| Defendant. ) | |

## DISA'S REPLY IN SUPPORT OF ITS MOTION FOR
## JUDGMENT ON THE PLEADINGS

Defendant DISA Industries, Inc. ("DISA") hereby submits its reply brief in support of its motion for judgment on the pleadings.

**I.    INTRODUCTION**

DISA demonstrated in its motion for judgment on the pleadings that Plaintiffs' Complaint should be dismissed because: (1) Plaintiffs lack authority to modify the amount of an employer's installment withdrawal liability payments after serving an initial demand letter; and (2) Plaintiffs' unlawful modification does not comply with the mandatory formula of ERSIA Section 4219(c) and therefore is unlawful. Plaintiffs fail in their opposition to respond in any meaningful way to these arguments. First, consistent with their non-responsive tenor to DISA's inquiries on this matter, Plaintiffs still have not provided any authority for unilaterally modifying an employer's installment withdrawal payments under of the Multiemployer Pension Plan Amendments Act ("MPPAA"). Absent such authority, their demand for increased payments is unenforceable. Second, Plaintiffs concede in their opposition that they did not follow the statutorily mandated formula of Section 4219(c) when re-calculating DISA's installment withdrawal liability

payments. On this ground alone, Plaintiffs' fail to sustain a claim for relief. This Court should therefore dismiss Plaintiffs' Complaint with prejudice, deny Plaintiffs' motion for summary judgment, and grant judgment in favor of DISA.

## II. ARGUMENT

### A. This Court May Determine The Amount of DISA's Installment Withdrawal Liability Payments By Applying The Plain Statutory Terms Of The MPPAA

In an effort to avoid judgment against them, Plaintiffs challenge the jurisdiction of this Court to determine the amount of DISA's installment withdrawal liability payments, claiming that "all disputes over withdrawal liability are to be resolved by arbitration." Plaintiffs' Opp at 2. This broad statement sweeps too far and is flatly wrong. It is well-settled that not all disputes under the MPPAA are subject to arbitration. E.g., T.I.M.E.-DC v. Management-Labor Welfare & Pension Funds, 756 F.2d 939, 945 (2d Cir. 1985) (the arbitration provisions of MPPAA do not constitute an absolute bar to federal jurisdiction but instead constitute an exhaustion of administrative remedies requirement within the court's discretion). Significantly, when a dispute involves legal questions of statutory interpretation, courts may properly resolve the dispute, and indeed often serve as the favored venue for such determinations. E.g., I.A.M. Nat'l. Pension Fund Ben. Plan C. v. Stockton TRI Industries, 727 F.2d 1204, 1209-10 (D.C. Cir. 1984) (because issue before court was purely one of statutory interpretation and exhaustion would not promote judicial economy or involve application of superior expertise, district court properly determined whether employer permanently ceased to have obligation to continue contributions under plan pursuant to contract); Park South Hotel Corp. v. New York Hotel Trades Council, 851 F.2d 578, 582 (2d Cir. NY 1988) (arbitration not required where case presented only legal questions of statutory interpretation and judicial economy would not be served by requiring arbitration); I.A.M. Nat'l. Pension Fund, Ben. Plan C v. Schulze Tool and Die Co., Inc., 564 F. Supp. 1285,

1293 (D.C. Cal. 1983) ("[t]he issue presented here requires an interpretation of a federal statute, the MPPAA, and an application of principles drawn from the body of federal labor law to facts that are essentially undisputed. Both requirements are more suitably met in a federal court than in arbitration").

The instant case therefore falls squarely within this Court's jurisdiction, and this Court can determine DISA's installment payment amounts without resort to arbitration.  As DISA noted in its motion, the <u>only</u> issue before this Court is the calculation of DISA's monthly installment payment amounts – a calculation which <u>requires</u> application of the unambiguous, mandatory formula of Section 4219(c).  <u>See</u> 29 U.S.C. § 1399(c).  DISA does not challenge before this Court Plaintiffs' assessment of its *total* alleged withdrawal liability.  That dispute has been submitted to arbitration consistent with the terms of the MPPAA.  Thus, the current dispute regarding Plaintiffs' unauthorized demand for increased installment payments is ripe for determination.  The parties have stipulated that the factual record is largely undisputed, the issue is purely one of statutory interpretation, and judicial economy favors immediate resolution of the current matter.[1]  Consequently, this Court can, and should, determine the amount owed by DISA for its installment payments pursuant to Section 4219.  Plaintiffs' false assertions to the contrary are unavailing.

    **B.**    **Plaintiffs Do Not Even Attempt To Oppose DISA's Showing That The Fund Lacks Authority To Unilaterally Increase DISA's Installment Payment Amounts**

---

[1] By determining the amount of DISA's withdrawal liability payments, this Court will narrow the dispute between the parties and advance prompt resolution before the arbitrator, consistent with the very purpose of the MPPAA.  See I.A.M. Nat'l Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 426-27 (D.C. Cir. 1987) (MPPAA aims at Congress' intent "to bring about expeditious resolutions" and avoid "unnecessary and costly" litigation).  Because any withdrawal liability ostensibly owed by DISA is limited by the twenty-year amortization provision of Section 4219, the amount of any installment payments owed would isolate the range of money at issue and consequently encourage a mutual resolution.

DISA established in its motion that Plaintiffs lack authority to modify DISA's installment payment amounts after issuing an demand initial demand letter and scheduling payments consistent with Section 4219. DISA Mem. at 8-10. Plaintiffs do not even attempt to respond to DISA's clear showing that their demand for increased payment is unauthorized and unlawful.[2] Indeed, Plaintiffs still have not cited a single case or statutory provision authorizing a plan sponsor to unilaterally modify an employer's installment liability payments. Instead, consistent with their past refusal to provide any legitimate basis for attempting to extract more money from DISA, Plaintiffs simply ignore this glaring authoritative void. Their failure to respond or provide authority for their sudden demand thus compels judgment for DISA.

In an effort to circumvent the plain fact that their increased demand is unauthorized and violates the clear language of Section 4219(c), Plaintiffs again champion the "pay now, arbitrate later" rule under which an employer must make its installment payments consistent with an <u>initial</u> demand letter while arbitration is pending. Plaintiffs' Opp. at 2-3. Their pithy recitation of this undisputed rule, however, does not constitute a meaningful opposition nor does it provide any basis for denying judgment in DISA's favor.

As DISA demonstrated in detail in its opposition to Plaintiffs' motion for summary judgment, Plaintiffs are equally subject to the "pay now, arbitrate later" rule upon which they premise their entire case. DISA's MSJ Opp. at 9-12. Under this rule, both an employer <u>*and*</u> a <u>plan sponsor</u> are bound by the withdrawal liability assessments of an initial demand letter, and

---

[2] Plaintiffs' wholesale failure to respond to DISA's showing that their claim for increased payments is unauthorized amounts to a concession of this point, mandating judgment in DISA's favor. <u>Bancoult v. McNamara</u>, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) ("if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded"); <u>United States v. Real Prop. Parcel 03179-005R</u>, 287 F. Supp. 2d 45, 61-62 (D.D.C. 2003) (failure to address argument equates to concession under the Local Civil Rule 7(b)).

4

neither party may attempt to change the amount owed while arbitration is pending. Id. Indeed, the MPPAA could not be more clear on this point: "[p]ayments shall be made by an employer…until the arbitrator issues a final decision with respect to the determination submitted for arbitration, *with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination*." 29. U.S.C. § 1401(d) (emphasis added). This express statutory statement plainly prohibits either party from modifying an employer's installment payment amounts, as both overpayments and underpayments must remain in effect pending arbitration. Thus Plaintiffs lack any basis for attempting to modify DISA's installment payment amounts while the parties engage in arbitration.

     Plaintiffs' attempt to characterize their re-calculation of DISA's installment payments as a "mistake" does change these largely immutable statutory mandates.[3] Plaintiffs must calculate DISA's installment payments pursuant to Section 4219(c), DISA must timely make these payments until the resolution of arbitration, and *neither* party may change the amount owed in the interim. Because Plaintiffs fail to provide any authority for their sudden increased demand for payment, this demand remains unlawful and illegitimate and cannot stand. On this ground

---

[3] As DISA demonstrated in its Opposition to Plaintiffs' Motion for Summary Judgment, Plaintiffs' claims of "mistake" and "transposition" errors reek of incredulity and mis-represent the facts of this case. See DISA's Statement of Disputed Facts at ¶¶ 10, 14, 16; DISA's MSJ Opp. at 12-13. As DISA has previously noted, Plaintiffs obtained their $978.00 increased demand amount by *re-calculating*, pursuant to a two-year average, DISA's highest average contributions. DISA's MSJ Opp. at 13. Plaintiffs themselves admit that this $978.00 determination derives from the calculation of only a two-year average contribution – which is plainly at odds with Section 4219(c) – while their original demand for $652.00 results from the statutorily-mandated three-year average. Plaintiffs' Opp. at 4-5. Plaintiffs increased demand, therefore, was no mere mistake. While DISA takes no position as to whether an obvious clerical error is remediable, it is clear that Plaintiffs' increased demand was not a clerical error, but was an affirmative change in position.

5

alone, this Court should dismiss Plaintiffs' Complaint with prejudice and grant judgment in favor of DISA.

      **B.**      **Plaintiff's Cannot Rebut That Their Increased Demand Is Unlawful Because The Clear And Unambiguous Statutory Language of ERISA Section 4219(c) *Requires* The Use Of A Three-Year Average When Calculating Installment Withdrawal Liability Payment Amounts**

Notwithstanding Plaintiffs' various efforts to re-characterize their increased demand as a "mistake" or to offer a one-sided exposition of the "pay now, arbitrate later" rule, Plaintiffs' increased demand must be rejected simply because it violates the clear and unambiguous terms of Section 4219(c).  It is axiomatic that where a statute is plain and clear on its face, it does not permit alternate construction and must be applied according to its express terms.  E.g., Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 254 (2000) ("In ERISA cases 'as in any case of statutory construction, our analysis begins with the language of the statute .... And where the statutory language provides a clear answer, it ends there as well' ") (citing Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999).[4]

As DISA demonstrated in both its motion and its opposition to Plaintiffs' motion for summary judgment, ERISA Section 4219(c), the statue provides only a single, mandatory formula for calculating an employer's installment payments.  In no uncertain terms, the statute states:

> [T]he amount of each annual payment shall be the product of:
>
> (1) the average annual number of contribution base units for the period of three consecutive plan years, during the period of ten consecutive plan years ending before the plan year in which the

---

[4] See also United States v. Perry, 479 F.3d 885 (D.C. Cir. 2007) (citing United States v. Merlos, 8 F.3d 48, 51 (D.C. Cir. 1993) and holding "some legal norms are absolutely clear (for example, because of the clarity of a statutory provision or court rule); in such cases, a trial court's failure to follow a clear legal norm may constitute plain error, without regard to whether the applicable statute or rule previously had been the subject of judicial construction").

6

>
> withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and
>
> (2) the highest contribution rate at which the employer had an obligation to contribute under the plan during the ten years ending with the plan year in which the withdrawal occurs.

29 U.S.C. § 1399(c) (emphasis added).

Section 4219 does not provide for any alternative formulas for calculating installment liability, nor does it allow a plan sponsor to selectively choose how many, or which, contribution years will factor into the calculation. As the plain terms of this provision make clear, there is <u>no discretion</u> regarding the calculation of an employer's installment liability payment amounts.[5] Plaintiffs' use of a two-year average therefore flatly violates Section 4219(c) and consequently cannot be enforced.

Moreover, Plaintiffs' own "Rules and Regulations" – adopted by the Fund's trustees, reviewed and approved by Plaintiffs' counsel in this case, and produced to DISA in response to its document requests – also expressly require the use of a <u>three-year</u> average when calculating an employer's installment liability payments. Specifically, in Section 8.11(b) of these rules and

---

[5] Notably, given the extent to which Congress detailed the various provisions and procedures of the MPPAA, the lack of an alternative formula is likely intentional. Had Congress determined that alternative calculations or discretionary input would be proper, it could have included language to this effect. However, unlike the provisions that control calculations of an employer's total withdrawal liability – which allow for discretion and provide multiple methods for computing liability, <u>see</u> 29 U.S.C. § 1391 – Section 4219(c) provides <u>only</u> the single three-year average calculation. Thus, there are no grounds to suggest that Congress contemplated anything but the use of a three-year average. In fact, given that Section 4219(c) aims at reflecting an employer's *proportional share* of a plan's unfunded benefit obligations, Congress likely sought to balance an employer's actual participation in a plan with the need to keep the plan funded. <u>See e.g.</u>, <u>Park South Hotel Corp. v. New York Hotel Trades Council</u>, 851 F.2d 578, 580 (1988) (an employer's past contribution history is considered in determining its proportionate share of unfunded benefits). As such, it makes sense that an employer who participated in a plan for less than three years would not be required to pay the same amount as long-time contributors to the plan, and thus a $0.00 contribution would factor into the three-year average.

regulations were, Plaintiffs adopt the exact terms of Section 4219(c).  See Ex. A.  These rules and regulations do not provide for *any* exceptions to this mandatory three-year average rule.  Thus, by Plaintiffs' own, self-regulated terms, it can only use a three-year average to calculate DISA's installment payment amounts.  Plaintiffs' attempt to fabricate new interpretations of law and internal company policy thus must be denied.  Similarly, their efforts to unlawfully extract more money from DISA, who has at all times complied with its obligations under the MPPAA, must be rejected.

### III.   CONCLUSION

For the foregoing reasons, DISA respectfully requests that the Court enter an Order granting Defendant's Motion for Judgment on the Pleadings and dismissing Plaintiff's claim against it with prejudice.

Respectfully submitted,

/s/
William G. Miossi (Bar No. 445265)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

July 9, 2008                                                            Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of July 2008, I caused a true and correct copy of the foregoing Reply in Support of DISA's Motion for Judgment on the Pleadings to be served electronically on the following:

> Marc H. Rifkind
> Slevin & Hart, P.C.
> 1625 Massachusetts Avenue, NW
> Suite 450
> Washington, D.C. 20036

/s/
William G. Miossi

9

DC:563704.1

# EXHIBIT A

**Pension Benefit Guaranty Corporation**

Benefits under this Plan are insured by the Pension Benefit Guaranty Corporation (PBGC). If the Plan should end or partially end, the PBGC will cover most normal Vested retirement benefits, Early Retirement benefits, and certain Disability and Survivor Benefits. However, the PBGC does not insure all types of benefits under covered plans, and the amount of benefit protection is subject to certain limitations.

The PBGC insures Vested benefits at the level in effect on the date the Plan ends. However, if a Plan has been in effect less than five years before it ends, or if benefits have been increased within the five years before the Plan ends, the whole amount of the Plan's Vested benefits or the benefit increase may not be covered. In addition, there is a ceiling on the amount of monthly benefits that PBGC covers. This ceiling is adjusted periodically.

For more information on PBGC insurance protection and its limitations, ask your Fund Administrator or the PBGC. Inquiries should be addressed to the Coverage and Inquiries Branch, Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20036, or call (202) 326-4000.

24

---

# RULES AND REGULATIONS OF THE NATIONAL SHOPMEN PENSION PLAN

Prepared by:
The Segal Company
Consultants and Actuaries

Reviewed and Approved by:
Slevin & Hart, P.C.
Fund Counsel

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| ARTICLE 1—DEFINITIONS | 29 |
| Section 1.01. Annuity Starting Date | 29 |
| Section 1.02. Beneficiary | 29 |
| Section 1.03. Calendar Year | 29 |
| Section 1.04. Collective Bargaining Agreement | 29 |
| Section 1.05. Contributing Employer | 30 |
| Section 1.06. Contributing Local Union | 30 |
| Section 1.07. Contribution Period | 30 |
| Section 1.08. Contribution Rate | 30 |
| Section 1.09. Covered Employment | 30 |
| Section 1.10. Employee | 31 |
| Section 1.11. Employer Contributions or Contributions | 31 |
| Section 1.12. ERISA | 31 |
| Section 1.13. Hour of Service | 31 |
| Section 1.14. Normal Retirement Age | 32 |
| Section 1.15. Participant | 32 |
| Section 1.16. Pensioner | 32 |
| Section 1.17. Pension Credit | 32 |
| Section 1.18. Pension Fund | 32 |
| Section 1.19. Pension Plan | 32 |
| Section 1.20. Trustee | 33 |
| Section 1.21. Trust Agreement | 33 |
| Section 1.22. Union | 33 |
| Section 1.23. Other Definitions | 33 |
| Section 1.24. Gender | 33 |
| ARTICLE 2—BASIS OF PARTICIPATION IN FUND | 34 |
| Section 2.01. Participation | 34 |
| Section 2.02. Termination of Participation | 34 |

25

(2) with respect to any year after 1980, the Contributions accrued through the end of the year if received by the Plan before March 1 of the following year and not included in the Contributions for an earlier year.

Payments of Withdrawal Liability shall not be considered Contributions.

(d) All corporations, trades, or businesses that are under common control, as defined in regulations of PBGC, shall be considered a single employer for purposes of this Article.

(e) Withdrawal Liability shall be determined on the basis of actuarial methods and assumptions adopted for this purpose by the Plan's enrolled actuary.

(f) In determining the amount of Vested benefits, the Plan actuary may:

(1) rely on the most recent complete actuarial valuation of the Plan and reasonable estimates for the interim years of the unfunded Vested benefits, and

(2) in the absence of complete data, rely on the data available or on data secured by a sampling which can reasonably be expected to be representative of the status of the entire Plan.

(g) In the case of a transfer of liabilities to another plan incident to an employer's withdrawal, the employer's Withdrawal Liability shall be reduced in an amount equal to the value, as of the end of the year preceding the year of withdrawal, of the transferred unfunded Vested benefits.

(h) A Withdrawal Liability of an employer for a Complete or Partial Withdrawal shall be reduced by the amount of any Partial Withdrawal Liability (reduced by any abatement or reduction of such liability) of the employer for a previous year.

(i) Amounts transferred to the Plan from any other plan shall be treated as Contributions by the employer that maintained such other plan to the extent that the amounts so transferred reduced the amount of Contributions which such employer was otherwise obligated to make under this Plan, or provided additional benefits under this Plan for Participants employed by

86

such employer, except as modified by Section 8.06(d), above.

(j) The term "PBGC" means the Pension Benefit Guaranty Corporation.

Section 8.10. Notice of Withdrawal Liability.

(a) An employer shall, within 30 days after a written request from the Trustees, furnish such information as the Trustees reasonably determine to be necessary to enable them to comply with the provisions of this Article.

(b) As soon as practicable after an employer's Complete or Partial Withdrawal, the Trustees shall notify the employer of the amount of the liability and the schedule for liability payments.

(c) No later than 90 days after the employer receives the notice described in subsection (b), it may:

(1) ask the Trustees to review any specific matter relating to the determination of its liability and the schedule of payments;

(2) identify any inaccuracy in the determination of the liability; and

(3) furnish any additional relevant information to the Trustees.

After a reasonable review of the matter raised, the Trustees shall notify the employer of their decision, the basis for the decision, and the reason for any change in the determination of the liability or schedule of payments.

Section 8.11. Payment of Withdrawal Liability.

(a) An employer shall pay the amount determined to be its Withdrawal Liability over the period of years necessary to amortize the amount in level annual payments, calculated as if the first payment were made on the first day of the year following the year of withdrawal and as if each subsequent payment were made on the first day of each subsequent year.

(b) The amount of each annual payment in the case of a Complete Withdrawal or a Partial Withdrawal under Section 8.03(a)(2) shall be the product of:

(1) the average annual number of contribution base units for which the employer was obligated to contribute for the 3 consecutive

87

DISA000050

88

years during the last 10 years preceding the year of withdrawal, in which the number of hours for which the employer had an obligation to contribute was the highest, multiplied by

(2) the highest Contribution Rate at which the employer had an obligation to contribute during the 10 years ended with the year of withdrawal.

(c) The amount of each annual payment in the case of a Partial Withdrawal under Section 8.03(a)(1) shall be the product of the amount determined under subsection (b), but with "first year of the 3-year testing period" submitted for "year of withdrawal", multiplied by the fraction determined under Section 8.07(b).

(d) Withdrawal Liability shall be payable in accordance with the schedule set forth by the Trustees beginning no later than 60 days after the demand for payment is made, notwithstanding any request for a review or appeal of the determination of the amount of such liability or of the schedule.

(e) Each annual payment shall be payable in 12 equal installments due monthly. If a payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made.

(f) The determination of the amortization period described in subsection (a) shall be based on the interest assumption used for Section 412 of the Internal Revenue Code (Funding Standard Account) for the year in which the withdrawal occurs.

(g) In any case in which the amortization period exceeds 20 years, other than in the event of a withdrawal described in Section 8.12, the employer's liability shall be limited to the first 20 annual payments.

(h) The employer shall be entitled to prepay the outstanding amount of the unpaid annual Withdrawal Liability payments, plus accrued interest, if any, in whole or in part, without penalty. If the prepayment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 8.12, the

89

Withdrawal Liability of the employer shall not be limited to the amount of the prepayment.

(i) In the event of a default, the Trustees may require immediate payment of the outstanding amount of an employer's Withdrawal Liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. The term "default" means

(1) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives notification from the Trustees of such failure, and

(2) the occurrence of any of the following events (each of which the Trustees have determined indicates a substantial likelihood that an employer will be unable to pay its Withdrawal Liability):

(A) the employer's insolvency, or any assignment by the employer for the benefit of creditors, or the employer's calling of a meeting of creditors for the purpose of offering a composition or extension to such creditors, or the employer's appointment of a committee of creditors or liquidating agent, or the employer's offer of a composition or extension to creditors; or

(B) the employer's dissolution; or

(C) the making (or sending notice of) any intended bulk sale by the employer; or

(D) an assignment, pledge, mortgage, or hypothecation by the employer of property to an extent which the Trustees determine to be material in relation to the financial condition of the employer; or

(E) the filing or commencement, by the employer, or the filing or commencement against the employer or any of its property, of any proceeding, suit, or action, at law or in equity, under or relating to any bankruptcy, reorganization, arrangement-of-debt, insolvency, adjustment-of-debt, receivership, liquidation, or dissolution law or statute or

DISA000051

90

amendments thereto, unless such proceeding, suit, or action is set aside, withdrawn, or dismissed within 10 days after the date of the filing or commencement; or

(F) the entry of any judgment or the issuance of any warrant, attachment, or injunction or government tax lien or levy against the employer or against any of its property which the Trustees determine to be material in relation to the financial condition of the employer, unless such judgement, attachment, injunction, lien, or levy is discharged, set aside or removed within 10 days after the date such judgment is entered or such attachment, injunction, lien or levy is issued; or

(G) the failure of the employer to maintain current assets in any amount at least equal to current liabilities plus such additional amount as the Trustees may determine is appropriate in the particular circumstances, current assets and current liabilities to be determined in accordance with generally accepted accounting principles and practices consistently followed; or

(H) default by the employer on any contractual obligation which the Trustees determine to be material in relation to the financial condition of the employer; or

(I) such other event as the Trustees may determine indicates a substantial likelihood that the employer will be unable to pay its Withdrawal Liability, provided written notice of such determination is given to the employer with a reasonable opportunity to demonstrate to the satisfaction of the Trustees that such determination was in error.

The Trustees, from time to time, may adopt written rules of general application defining additional events which they determine indicate, alone or in combination, a substantial likelihood that an employer will be unable to pay its Withdrawal Liability.

(i) Except as provided in subsection (f), interest under this section shall be charged at rates based on prevailing market rates for comparable obligations.

Section 8.12. Reduction of Partial Withdrawal Liability.

(a) (1) If, in each of any 2 consecutive years following the year of a Partial Withdrawal under Section 8.03(a)(1), the number of hours for which the employer has an obligation to contribute is not less than 90 percent of the average number of contribution base units described in Section 8.03(a)(1), then the employer shall have no obligation to make payments for such Partial Withdrawal (other than delinquent payments) for years beginning after the second consecutive year following the year of Partial Withdrawal.

(2) For any year in which the number of contribution base units for which an employer that has partially withdrawn under Section 8.03(a)(1) has an obligation to contribute equals or exceeds the number of contribution base units in the highest year determined under paragraph (1) without regard to "90 percent of," the employer may furnish to the Plan in the amount determined under Section 8.07) a bond to the Plan in the amount determined (in lieu of payment of the Partial Withdrawal Liability determined under Section 8.07) a bond to the Plan in the amount determined by the Trustees (not exceeding 50 percent of the annual payment otherwise required).

(3) If the Trustees determine under paragraph (1) that the employer has no further liability for the Partial Withdrawal, then the bond shall be cancelled.

(4) If the Trustees determine under paragraph (1) that the employer continues to have liability for the Partial Withdrawal, then:

(A) the bond shall be paid to the Plan;

(B) the employer shall immediately be liable for the outstanding amount of liability due for the year for which the bond was posted; and

(C) the employer shall continue to make the Partial Withdrawal Liability payments as they are due.

91

DISA000052